HARRIS, Judge.
Appellant was put to trial upon an indictment charging murder in the first degree. The jury returned a verdict finding appellant guilty of murder in the second degree and fixed his punishment at 25 years in the penitentiary. Throughout all the trial proceedings in the Circuit Court of Madison County, appellant was represented by experienced trial lawyers of his choice. At arraignment he entered a plea of not guilty relying on self-defense. After sentence was imposed, he gave notice of appeal. The trial court determined that appellant was indigent and a free transcript was furnished him. Trial counsel was appointed to represent him on appeal.
The evidence adduced by the State is in sharp conflict with the evidence introduced by appellant. The tendencies of the State’s evidence showed that appellant committed an unprovoked and senseless murder and that he was wholly at fault in bringing on the difficulty. According to the testimony of appellant his life was in imminent danger at the time he fired the fatal shots and that he was wounded during the exchange of gunfire.
At the conclusion of the State’s case appellant made a motion to exclude on the ground the State had failed to make out a prima facie case. This motion was overruled, and appellant filed a motion for a new trial and this motion was overruled and denied.
On September 24, 1975, appellant and a co-worker, Harvey Hyder, arrived in Huntsville, Alabama, from Metairie, Louisiana, a town located about ten miles from New Orleans. They were engaged in the business of selling water softeners. They registered at the Tourway Inn which was located across the street from the Diplomat Inn. While at work they met a woman who was employed by the same company and that night the three went to dinner together. After dinner someone suggested they go to the Diplomat for a drink. The three went to the lounge in the Diplomat. Appellant claimed he did not have a drink on this occasion and left Hyder and the woman and went back to the Tourway Inn where he remained for 45 minutes to an hour. He then decided to rejoin his companions at the Diplomat, but they had gone when he entered the lounge.
While looking for his companions appellant was accosted by a man who asked him to have a drink with him and he sat at the table with this man who introduced himself as Mr. Simmons. Mr. Simmons was actually the deceased, James Moss, Sr. Moss ordered drinks and when they were delivered, he asked the waitress to kiss appellant. This happened on more than one occasion and Moss asked the waitress to kiss appellant again and she did. Soon thereafter they were joined by two other men, Steve Kirkland and William Scott, and someone suggested a game of poker. After playing cards at one of the booths awhile, Kirkland *46 suggested that the game be moved to the dining room area of the Diplomat. The game continued and appellant and the deceased began to lose regularly. Appellant claimed that the drinks he had been served made him dizzy. Appellant lost most of his money and Kirkland then offered to loan him money on one of the two rings he was wearing as collateral. Kirkland loaned appellant some money on the ring and the game continued and appellant continued to lose. At this time they were playing $5.00 limit. Kirkland stated they should not be gambling in a public place and suggested they go to an apartment for a party where some girls would be.
Appellant was asked to drive Mr. Moss, Sr., so that he could show him how to get to the apartment. They were going to Apartment C of the Haystack Apartments. Appellant walked across the street to the Tourway Inn and got his car and drove in front of the Diplomat Inn and picked up Mr. Moss and they followed Kirkland and Scott to the apartment. When they arrived at the Haystack Apartments, the game continued and appellant kept losing. Kirkland loaned appellant some money on the other ring and subsequently Kirkland loaned appellant some money on his watch. A question arose about the number of cards in the deck as appellant saw two or three cards on the floor and appellant stated he had a deck of cards in his car and he left the apartment to get this deck from his car. He was gone four or five minutes and when he returned, he announced he could not find the cards, but unknown to the others, appellant got his pistol and concealed it in his pocket. Appellant suggested that he and Kirkland play “show down” poker and again appellant lost his money. Kirkland then told appellant he was indebted to him in the amount of $650.00. Appellant replied that he did not owe him that much money and they got into an argument over the amount of money that appellant owed Kirkland.
About this time Mr. Moss was pretty much intoxicated and asked appellant to take him back to his car at the Diplomat.
According to the State’s evidence the son of the deceased, James Moss, Jr., was working at the bar at the Diplomat on the night of the shooting and saw his father and appellant leave the Diplomat. He was told by either Kirkland or Scott they were going to the Haystack Apartments and to come by when he closed the bar for the night. Young Moss came to the Apartment C in the early morning hours of September 25, 1975, and watched the poker game until it broke up at about 4:30 a. m.
Appellant and James Moss, Sr., walked out the door of the apartment ostensibly to be driven by appellant to Moss’ car at the Diplomat, but, according to the State’s evidence, they reentered the apartment in ten to fifteen seconds with appellant having a pistol pointed directly in the back of Mr. Moss. Appellant ordered everyone present to put their money on the table together with both of his rings and watch. Appellant’s orders were complied with and when the money and rings were placed on the table, appellant discovered that his watch was missing. He asked who had his watch and everyone denied having the watch. Appellant pointed his pistol at Scott and told him he was the last one who had his watch and that he was going to give him three counts to surrender the watch. He started counting and when he got to “two” Scott said he didn’t have the watch but pulled off his own watch and put it on the table. The appellant stated he wanted his own watch. Young Moss told his father that if he had the watch to put it on the table. Mr. Moss, Sr., then took the watch out of his pocket and put it on the table. Appellant gathered up the money, his watch and both of his rings.
Young Moss then told appellant that he had recovered all of his property and to leave the apartment. Appellant told young Moss to “shut up” and fired a shot in his direction stating “that was a blank but the rest of them are not.” The deceased, James Moss, Sr., then said, “Well, these are not blanks,” and both appellant and the deceased began firing. Some eight or ten shots were fired and when the shooting was *47 over, Steve Kirkland had been shot, the deceased was shot and was pronounced dead on arrival at the hospital, and appel- - lant was shot twice by the deceased.
Appellant left the apartment and got in his car and drove several blocks before stopping his car, opened the door and fell to the pavement. A police officer saw appellant when he fell out of his car and went to him to render aid and assistance until an ambulance could get there. Appellant cursed the officer and told him to stay away. Appellant was carried to a local hospital for emergency treatment.
The police inventoried appellant’s car and found a deck of cards though appellant told the men in the apartment he could not find his cards. The officers also found a .38 revolver, a black holster and two boxes of ammunition under the front seat of appellant’s car. The revolver contained six spent cartridges and this was turned over to the State Toxicologist. An autopsy was performed on the body of the deceased and several bullet wounds to the body were found. A bullet was recovered from one of these wounds and was also turned over to the Toxicologist. The revolver was test fired and a microscopic comparison was made with the slug removed from the body of the deceased. The test showed that this slug had been fired through the barrel of the .38 revolver found in appellant’s ear. Death resulted from hemorrhage and shock associated with the bullet wounds.
A .32 caliber pistol was found by the officers in the apartment where the shootout occurred. A slug was removed from the appellant and the laboratory test revealed that this slug had been fired through the barrel of the .32 pistol and that this pistol was in the hands of the deceased during the shoot-out.
Appellant’s version of the shooting was very different from the State’s testimony. He claims that when he saw some cards on the floor, he asked what was going on and everyone in the room started accusing him of saying he was cheated out of his money, rings and watch. He claimed that he did not fire the first shot. He stated that James Moss, Jr. charged him and at the same time he felt pain in his side and then an explosion. It was then that he started shooting.
There are many more details leading up to and culminating in the shooting but we see no necessity in setting them out.
Appellant contends the trial court committed many errors that should work a reversal of this case from the beginning of the trial to the end. His first claim of error occurred when the trial court introduced the District Attorney to the jury venire by saying, “representing the State of Alabama, our District Attorney.” Appellant contends this introduction was highly prejudicial as it tended to show that the judge and the District Attorney were aligned on one side and the defense on the other. The record shows that the Court said:
“Representing the State of Alabama, our District Attorney, Mr. Fred Simpson, and his Chief Assistant, Mr. Bart Loftin. Representing the Defendant in this case is Mr. Earl Cloud, Mr. Joseph Berry and the Defendant is seated with them.”
It is common practice for trial judges to introduce the lawyers who are going to try any case, criminal or civil, and we do not deem it necessary to say any more in this regard. Certainly no error intervened in the above-quoted introduction to the jury.
Appellant also claims that the trial court abused its discretion in allowing the prosecuting attorney to ask the jury certain questions on voir dire. The matter of instant concern, as shown by the record, is as follows:
“MR. SIMPSON: Has any member of this venire ever been a witness against the State, that is, have you ever been to court and testified for someone charged with a crime? Have you ever been a witness against the State of Alabama?
“MR. CLOUD: Your Honor, if the Court please, we would object to the phraseology of that; if you are going to be a witness you are not a witness for or against; you are called at the instance and we object to that phraseology.
*48 “THE COURT: Well, I think as the question was re-phrased it is acceptable.
“MR. CLOUD: We except.
“THE COURT: Ladies and gentlemen, you understand that Mr. Simpson is asking whether or not any of you have testified in behalf of a defendant in a criminal crime.
“MR. SIMPSON: Let me further clarify it. I am not saying that you have any ill-will against the State. I am talking about the difference if you were called by the defense or called by the State of Alabama. There’s nothing wrong with it.”
Title 30, Section 52, Code of Alabama 1940, provides as follows:
“In civil and criminal cases, either party shall have the right to examine jurors as to their qualifications, interest, or bias that would affect the trial of the case, and shall have the right, under the direction of the court, to examine said jurors as to any matter that might tend to affect their verdict.”
Both this Court and the Supreme Court have held that the scope of voir dire examination is within the sound discretion of the trial judge. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844; Fletcher v. State, 291 Ala. 67, 277 So.2d 882; Smith v. State, 292 Ala. 234, 292 So.2d 109; Clark v. State, 294 Ala. 493, 318 So.2d 822.
We cannot say that the trial judge abused his discretion in this case. Clearly, there was no evidence of bad faith nor an attempt to prejudice appellant in propounding the subject question to the jury.
Next appellant urges reversible error was committed by the prosecuting attorney in his opening statement to the jury that it was not illegal to play bridge or poker at home with friends. After objection was overruled, the prosecuting attorney withdrew this statement. At the beginning of the trial the Court told the jury that statements of attorneys were not to be considered as evidence in the case. The Court further stated:
“Ladies and gentlemen, after the summation, the closing argument of counsel I will instruct you on the law in the case. You will reserve any judgment you have about what the law is until you hear it from me.”
The prosecuting attorney having withdrawn his statement and the trial court having told the jury they must look to him to charge them on the law of the case, we hold error to reverse was not committed.
There was no error on the part of the trial court in suggesting that venue had not been proved and allowing the State to reopen the case and prove the venue of the crime. Anderson v. State, 104 Ala. 83, 16 So. 108.
Appellant urges this Court to reverse the trial court for failure to grant his motion to exclude the State’s evidence for failure to make out a prima facie case. The Supreme Court in Young v. State, 283 Ala. 676, 220 So.2d 843, held:
“Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State’s evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error.”
The holding in Young, supra, is applicable to this case and the trial court properly submitted the issue of appellant’s guilt to the jury.
In his closing argument the District Attorney stated, “The law in its infinite wisdom says that a men to save his own neck will lie.” Defense counsel objected to this statement and the Court specifically instructed the jury that it was the Court’s duty to charge as to the law, and it was the duty of the jury to take the law as given by the Court. If error was committed by the District Attorney, it was completely cured by the Court’s instructions. Mabry v. State, 40 Ala.App. 129, 110 So.2d 250.
We have carefully reviewed the refused charges in the light of the extensive oral charge and find that the refused *49 charges stating correct legal principles of law were fully, adequately and substantially covered in the oral charge. Title 7, Section 273, Code of Alabama 1940.
We have carefully examined this three-volume record for errors which injuriously affected the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.